UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
TOINDRA RAMDEO,

                        Petitioner,                                    **MEMORANDUM AND ORDER**

        -against-                                                        04-CV-1157 (SLT)(RLM)

WILLIAM PHILLIPS, Superintendent
of Green Haven Correctional Facility,

                        Respondent.
--------------------------------------------------------x
**TOWNES, United States District Judge:**

        Petitioner, Toindra Ramdeo, a citizen of Guyana, brings the instant petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254, challenging his 1997 conviction for murder in the

second degree.  For the reasons set forth below, this petition is denied and this action is

dismissed.

## BACKGROUND

        In the early morning hours of October 1, 1995, two separate incidents involving machete-

wielding assailants occurred within a mile of each other in Queens County, New York.  The first

incident occurred at a party at 107-24 123rd Street in South Richmond Hill where, at around 2:30

a.m., one Lakeraj Ramkishun was injured after being repeatedly struck on the head with a

machete.  In a second, separate incident which occurred about an hour and a half later, one

Alfred Anthony Salerno was killed on 106th Street between 109th and Liberty Avenues in

Richmond Hill.

        Within two days of the homicide, the police obtained a written statement from petitioner,

in which petitioner admitted involvement in both crimes.  Petitioner stated that he owned a

machete, which he kept in the trunk of his white Toyota sedan, and that he had permitted a friend

to use it to attack Ramkishun.  Petitioner further admitted that he, himself, had used the machete

to attack Salerno. Thereafter, petitioner was arrested a charged with murder in the second degree under three separate theories (intentional murder, depraved indifference murder, and felony murder) and other lesser offenses in connection with the Salerno incident, and with attempted murder in the second degree and other lesser offenses, including assault in the second degree, in connection with the Ramkishun incident.

**The Suppression Hearing**

Prior to the start of trial, petitioner's counsel, Leslie Nizim, Esq., moved to suppress petitioner's written statement on the grounds that it was a fruit of an unlawful arrest and was involuntarily made. The court granted petitioner a *Dunaway/Huntley/Mapp* hearing, which was held before Queens County Supreme Court Justice Thomas Demakos over three days in late March and early April 1997.

**The Prosecution Evidence**

At the hearing, the prosecution presented testimony from three of the detectives who investigated the Salerno homicide: lead Detective Larry Schwartz of the 106th Precinct and Detectives James Annunziata and Vincent Grecco of the Queens Homicide Squad. Schwartz testified that he and his partner, Detective Barden, were assigned to the homicide at approximately 4:45 a.m. on October 1, 1995 – less than an hour after the homicide allegedly occurred (55-56).[1] Schwartz promptly notified the Queens Homicide Squad of the murder and Squad Detectives James Annunziata and Vincent Grecco were assigned to assist in the investigation.

---

[1]Numbers in parentheses denote pages in the transcript of the suppression hearing. A name preceding such a number indicates the witness whose testimony appears on that page.

Schwartz, Annunziata, and Grecco all responded to crime scene, where other officers were already busy "canvassing" the residents of 106th Street in an effort to find eyewitnesses to the murder (Schwartz: 56). Annunziata joined in this effort and, around 10:00 a.m., spoke to a woman named "Norma," who occupied a second-floor apartment overlooking 106th Street (Annunziata: 6, 22). Norma told Annunziata that sometime between 3:00 and 3:45 a.m. on October 1, 1995, she heard loud screaming and yelling from the street. Looking out her window, Norma observed three or four Indian men in their teens or twenties, running up and down the block as if they were looking for something or someone. (Annunziata: 6-8). One of the men, whom Norma described as skinny and 5'6" to 5'7" tall, was carrying a machete (Annunziata: 21). Norma also observed a white Toyota sedan, with a New York license plate bearing a number beginning "J1Z" or "JZ1," double-parked near her house (Annunziata: 7, 23).

As Norma watched, a Caucasian man – also in his teens or twenties – emerged from alongside Norma's building with two bottles in his hands (Annunziata: 7-8). He threw the bottles at the Indian men, then began running south on 106th Street toward Liberty Avenue (Annunziata: 7). The men gave chase and the Toyota followed them, driving in reverse (Annunziata: 7, 22). Norma watched until the men and the automobile disappeared from view, then called "911" (Annunziata: 22).

Later that morning, Schwartz learned that a machete had been used in an assault on 123rd Street shortly before the Salerno murder (Schwartz: 43, 58). Schwartz went to the scene of the assault, where he spoke to one of Ramkishun's relatives (Schwartz: 58-59). The relative described the perpetrator as a Guyanese male, who had "crashed" a party at 107-24 123rd Street (Schwartz: 60-61). According to the relative, the perpetrator had pulled the machete from the

trunk of a small, white vehicle, "possibly a Toyota," knocking clothing out the trunk and onto the ground in the process (Schwartz: 44, 61).  The car then drove away, leaving the clothing to be recovered by the victim's relatives (Schwartz: 44, 61).  That clothing was of the sort worn by automobile mechanics, and included a blue work shirt bearing the name, "Marino Service Station," and work pants bearing the name, "Ronnie" (Schwartz: 61).

The detectives quickly ascertained that the Marino Service Station was located at 90th Street and 101st Avenue, but the station was closed for the weekend (Schwartz: 45).  Therefore, Detectives Schwartz, Annunziata and Grecco had to wait until the station opened on Monday, October 2, 1995.  According to Schwartz, the three detectives arrived at the service station between 8:30 and 8:35 that morning, and spoke to the owner, who stated that a "Ronnie" worked there and owned a small white car (46, 89).  Informed by the owner that Ronnie was expected at work that morning, the detectives remained at the station where, sometime before 9:00 a.m., they observed petitioner's brother, Ronnie Ramdeo, arrive in a white, four-door Toyota bearing New York license plate J219HH (Schwartz: 47, 64).

The detectives identified themselves and told Ronnie that they wanted to speak with him at the precinct, but did not explain what they wished to discuss (Schwartz: 48, 63; Grecco: 118).  Ronnie agreed to accompany the detectives (Schwartz: 48).  At Grecco's request, Ronnie also agreed to allow Grecco to drive his Toyota to the precinct, and handed Grecco the keys to the car (Schwartz: 48; Grecco: 117).  While Grecco and Annunziata were speaking to Ronnie, Schwartz looked through the windows of the Toyota and saw what appeared to be blood stains inside the vehicle (Schwartz: 48-49).

Upon arriving at the 106th Precinct, the detectives questioned Ronnie about the car (Schwartz: 49, 67; Grecco: 118).  Ronnie told the detectives that the Toyota belonged to

petitioner, and that petitioner had been driving it the night of the murder (Schwartz: 49-50). Ronnie also provided the detectives with petitioner's work address: an automobile repair shop near the intersection of 134th Street and Rockaway Boulevard (Schwartz: 49-50).

Although both Schwartz and Grecco recalled departing for petitioner's workplace shortly after Ronnie made his statement, there was conflicting testimony as to precisely when the statement was made and when they departed. Schwartz initially testified that Ronnie had not even arrived at work until sometime between 8:30 and 9:00 a.m. (47), then testified on cross-examination that Ronnie had arrived at the precinct sometime between 8:00 and 8:30 a.m. (65) and that petitioner had been brought to the precinct by 9:00 a.m. (73). Grecco, on the other hand, testified that Ronnie made the statements around 8:00 a.m., shortly after arriving at the precinct, but that he and Schwartz did not leave the precinct until 10:30 that morning (117, 119, 139).

Both Schwartz and Grecco agreed, however, that they both traveled to petitioner's workplace on the morning of October 2, 1995, and persuaded petitioner to return with them to the precinct. Grecco readily admitted lying to petitioner by telling him that his brother had been involved in a car accident and that the police wanted to talk about the accident (100, 120). Schwartz, who specifically remembered speaking to petitioner inside the repair shop (51), did not recall exactly what was said to petitioner, but testified that the detectives might have said petitioner's brother had been in an accident (69). Both detectives testified that it took four or five minutes to drive petitioner back to the precinct, and that they did not speak with petitioner during that time (Schwartz: 70; Grecco: 121, 124). However, the detectives disagreed as to when petitioner entered the precinct; Schwartz estimated that he arrived around 9:00 a.m. (72), while Grecco first testified that he arrived between 10:30 and 11:00 a.m. (101), then stated that

petitioner arrived about 11:05 a.m. (121).

Upon arriving at the precinct, petitioner was taken to an interview room, located on the same floor of the 106th Precinct as the Captain's room in which his brother, Ronnie, was then sitting (Grecco: 121). Although petitioner was principally questioned by Grecco (Grecco: 121; Schwartz: 71), the detectives disagreed as to who else might have been in the interview room at the time of the interrogation. Grecco recalled that Schwartz was in the room and that Annunziata may have come in and out (112, 122). Schwartz, however, testified that he was in and out of the room (74), but recalled that Annunziata was in the room with Grecco initially and subsequently left (72). Annunziata testified that he did not participate in the questioning at all, but had observed petitioner with Grecco in a small room on the second floor (26-27, 37).

Grecco began the interview by introducing himself as a Queens Homicide detective (101). Grecco speculated that this introduction caused petitioner to suspect that his brother had not been injured and that he had been lured to the station under false pretenses (101), but petitioner made no effort to end the interview or to leave the precinct. To the contrary, when Grecco then proceeded to read petitioner his *Miranda* rights, petitioner acknowledged understanding the rights and agreed to talk to Grecco (101-04).

For the next 30 to 45 minutes, Grecco asked petitioner for information concerning his background (Grecco: 126-27). During that conversation, Grecco learned that petitioner was a citizen of Guyana (127). However, there was no testimony at the hearing to suggest that Grecco offered to contact the Guyanese consulate on petitioner's behalf or advised petitioner of his rights under the Vienna Convention on Consular Relations.

Grecco then asked petitioner about his activities on the night of the two incidents (104-05). When petitioner began talking about an incident involving a machete, Grecco interrupted

him to ask if he would make a written statement (105).  Petitioner declined to write the statement himself, saying he did not write well enough to do so (105).  Grecco then offered to scribe for petitioner, saying he would read the written statement to petitioner and give him an opportunity to make revisions (105).  According to Grecco, petitioner agreed to this proposition and began to dictate his account of the incidents (105-06).

It is unclear precisely how long it took to record petitioner's statement.  On direct examination, Grecco testified that petitioner began dictating his three-page statement at 12:30 p.m. (106), but then testified on cross-examination that petitioner completed giving his statement between 12:30 and 1:00 p.m. (122).  However, Grecco also testified on cross-examination that it took one and one-half to two hours to take petitioner's statement and that petitioner did not sign the written statement until 2:50 p.m. (122-23).

The signed statement was introduced into evidence at the hearing, and read into the record by Grecco (108-111).  In the statement, petitioner stated that he drove his cousin, Richie, and three friends – Kevin, "Sexy," and Sexy's girlfriend – to a party at 162nd Street and Hillside Avenue at about 10:00 or 11:00 p.m. on September 30, 1995 (109).[2]  They remained at the party for an hour and one-half, until petitioner and his friends "got into a fight with a couple of other guys over a girl" (109).

Petitioner then drove Richie, Sexy and Kevin to another party on 123rd Street (109).  Sexy and Kevin "went in to check it out," while petitioner and his cousin waited in the car (109).  Five or ten minutes later, Sexy and Kevin re-emerged, fighting with a man from the party (109).

---

[2]In the hearing and trial transcripts, petitioner's cousin is variously referred to as "Ritchie" and "Richie."  In transcribing petitioner's statement, Detective Grecco referred to the cousin as "Richee."  Although it is unclear which spelling is correct, this Court will, in the interest of simplicity, use the name, "Richie."

Kevin returned to the car to ask petitioner to "pop" open the trunk, which petitioner did (109). Although Kevin did not explain what he wanted from the trunk, petitioner told Grecco that "everybody" knew petitioner kept a machete there (109). Petitioner also told Grecco that he then drove a block away "because [he] didn't want anyone to get [his license] plate number" (109-10).

About two minutes later, Sexy and Kevin ran back to the car and jumped into the back seat (110). Petitioner recalled that one of the two was carrying the machete, although he did not recall which one of his friends had it (110). Petitioner then drove to 106th Street and Liberty Avenue, where he, Sexy, and Kevin stayed in a sports bar, drinking beer, until the bar closed around 4:00 a.m. (110). Richie did not enter the bar, but went to sleep in the back seat of the car (110).

As petitioner and his two friends were returning to the car, a woman screamed at them to be quiet (110). As petitioner started to drive away on 106th Street, a bottle struck petitioner's car (110). Petitioner stopped his car and emerged from his vehicle to see a Caucasian man cursing at him (110). An argument ensued, during which petitioner's friends also exited the vehicle (110). The man then ran north on 106th Street and disappeared into an alley (110). When petitioner and his friends passed the alley, the man re-emerged from the alley and threw two more bottles at petitioner's car, prompting petitioner and his friends to chase him back down 106th Street (110).

Petitioner and his friends caught up with the man in an alley, where he attempted to escape by climbing on top of a red car (111). Petitioner struck the man at least five times with the machete (111). Petitioner told Grecco that he did not remember seeing much blood following the attack, so petitioner and his friends left the man lying in the alley, got back in their

8

car, and went home (111).

Grecco unequivocally testified that petitioner gave the statement entirely "on his own" (129). Petitioner was not handcuffed at any point during the interrogation (111), and was permitted to leave the interview room to use the bathroom (111, 137). Petitioner was also given a soda and, perhaps, some coffee (111, 137), although Grecco could not recall whether petitioner had anything to eat while in the interview room (138). Grecco also testified that he read the statement back to petitioner, who declined to make any changes and agreed to sign it (106-07).

Grecco then asked petitioner if he would agree to make a videotaped statement, but petitioner declined (Grecco: 141). Accordingly, Grecco did not request that an Assistant District Attorney be sent to the precinct (Grecco: 127). Grecco testified that he believed Schwartz might have contacted the District Attorney's Office (127, 137), but there was no evidence that Schwartz had requested the presence of a prosecutor. Indeed, Schwartz did not mention contacting the District Attorney's Office, even though he testified that he had appeared before a judge to apply for a warrant to search the Toyota sometime in the late morning or early afternoon of October 2, 1995 (Schwartz: 65, 81-82).[3]

Grecco denied that he or any other officers had raised their voices at any point during the interrogation, or that Grecco had threatened petitioner by saying he did not like to see blood (129-30). Grecco admitted that one of the photographs taken following the interview showed a red mark over petitioner's eye, but both he and Schwartz denied that they or any other officers had struck petitioner (Schwartz: 81; Grecco: 129, 131). While Grecco could not recall if there were any marks on petitioner's face when Grecco met him at petitioner's place of employment

---

[3]That search was ultimately conducted by a Detective Doyle of the Crime Scene Unit (Schwartz: 52). Doyle did not testify at the hearing, and there was no testimony concerning what, if anything, was recovered as a result of the search.

(121, 142), Schwartz recalled that petitioner had some cuts and scratches on his face when he arrived at the precinct and had explained the injuries by saying that he had been in a few fights the night before (Schwartz:  77-78).

Sometime after petitioner signed the written statement, the police asked both petitioner and Ronnie for permission to search the basement apartment they shared at 109-21 134th Street in South Ozone Park, Queens.  Both brothers orally consented to the search, and a sergeant in the 106th Precinct directed Annunziata to type up consent forms for both petitioner and Ronnie (Annunziata:  8, 27-28).  Annunziata completed this task within five or ten minutes, and presented a completed form to Ronnie for his signature around 5:00 p.m., asking, "Would you give your consent for us to search your apartment?"  (9, 28, 31).  After Ronnie signed, Annunziata went to the interview room, where petitioner signed another consent form around 5:05 p.m. (28).

Thereafter, Annunziata, accompanied by Ronnie and a Sergeant Smith, conducted a search of the brothers' basement apartment (Annunziata: 10-11).  At the foot of the stairs leading to the basement apartment, they found a black Fila sneaker with blood stains on it (11, 15).  Underneath the stairs, they found a machete with blood on the blade (11).  Annunziata asked Ronnie if he knew about the weapon, but Ronnie denied any knowledge (12, 38).  Next to the machete, Annunziata found a gym bag and a wallet (12).  After asking Ronnie if the wallet was his and learning that it was not, Annunziata opened the wallet and discovered various identifications belonging to Salerno (12, 15, 38).

In the middle of the bedroom floor, the officers found tan pants and a long-sleeved shirt, both of which had blood on them (12).  Annunziata asked Ronnie if the clothes belonged to him

(38). When Ronnie denied that they did, Annunziata inquired as to who slept in the large double bed in the living room – the only bed in the house (14). Ronnie stated that he and his brother both used the bed and that they were the sole residents of the apartment (14).

Following the search, Annunziata, Ronnie and Smith all returned to the precinct (37). There, the brothers – who had been kept separate until that point – were allowed to see each other before petitioner was taken to Central Booking (Schwartz: 84-86). Schwartz was uncertain of the exact time that petitioner left the precinct, but believed that it was sometime in the evening (84-85). Schwartz estimated that petitioner had been at the precinct for approximately seven or eight hours by the time he was transported to Central Booking (71-72).

### The Defense Evidence

Both petitioner and his brother, Ronnie, testified at the hearing in an effort to establish that petitioner's statement was not voluntarily made. Ronnie testified that he lived with his brother at 109-21 134th Street, and that the brothers both slept in the same bed (147, 168). On October 2, 1995, Ronnie awoke petitioner at around 7:45 a.m. to ask him for money to pay the rent (147). Ronnie recalled speaking with petitioner for a minute or so, and testified that his face appeared "normal" at the time (148).

Ronnie arrived at work around 7:55 a.m. to find four detectives waiting for him (148). According to Ronnie, he agreed to speak to the detectives at his workplace (182), but they insisted on taking him to the precinct (149, 182-83). They handcuffed him, then removed the keys to his car from his pocket, before transporting him to the 106th Precinct (149).

At the precinct, Schwartz questioned Ronnie concerning his whereabouts on the night of the incidents. Ronnie told Schwartz that he was with his cousin at his uncle's house (185). According to Ronnie, Schwartz then began "screaming and yelling," accusing Ronnie of "lying"

and of involvement in the incident at 123rd Street and the murder (150, 188, 190). Schwartz said that he had witnesses who had purportedly seen Ronnie at the crime scenes, and showed Ronnie the clothes that had been recovered from 123rd Street (184, 197). Ronnie alleged that, at times during the interrogation, Schwartz acted as if he were preparing to slap him, but that Schwartz never actually struck him (168, 188, 197).

Thereafter, Ronnie gave a statement to the police (150). Ronnie did not write the statement himself, but read and signed a writing prepared by one of the detectives (188-89). The police also asked for information about other people, including petitioner, and Ronnie supplied them with information, including his brother's work address (150, 185-86).

Although Ronnie remained inside a room at the precinct and had no watch or other means of knowing the time (170), Ronnie testified at the hearing that the police brought his brother to the precinct around 11:00 that morning (150). Thereafter, Ronnie heard Schwartz screaming and yelling for about 20 minutes in an adjacent room (151, 198-99). Sometime between 11:00 and 11:30 a.m., the police informed Ronnie that petitioner had given them a statement and asked Ronnie if he wanted to see his brother (151-52, 192). Ronnie was then escorted next door by Schwartz and another detective. Standing in the doorway, Ronnie was able to see petitioner seated four to six feet away, handcuffed to a chair (152, 193). Ronnie testified that his brother had a black eye and a cut on his forehead above his left eye, and that blood was dripping down petitioner's face (152, 200). Ronnie was prevented from entering the room and did not speak to petitioner, but simply looked at him for a minute or two (152, 174-75, 200).

At the hearing, petitioner also testified concerning his version of the events preceding this encounter with his brother. Petitioner testified that Schwartz and two other detectives came

to his place of employment on October 2, 1995 (208). Although petitioner was not wearing a watch and could not recall the exact time, he estimated that the detectives arrived sometime between 9:30 and 10:00 a.m. (209). The detectives told petitioner that his brother had been in an accident, and petitioner agreed to accompany them to the precinct (209). Petitioner was not handcuffed, but voluntarily got into a police vehicle for the ride to the 106th Precinct (209).

There was no conversation during that ride (210). Upon arrival at the precinct, petitioner was taken to the second floor and placed in a room with five detectives (210). According to petitioner, the detectives did not read him his *Miranda* rights, but immediately asked where he had been on the night of the incidents (210). When petitioner failed to reply and put his head down on the table, one of the detectives other than Schwartz, Annunziata, or Grecco struck him three times across the back of the head with his hand (211-12).

Asked again for his whereabouts, petitioner claimed that he had been at his cousin's house, but had gone home around midnight (212). Another detective, who petitioner thought was "the chief," then slapped petitioner across his lips, leaving his bottom lip "busted" (212-13). After this detective left the room, another detective – possibly Annunziata – showed petitioner the clothes that had been left on 123rd Street and divulged that witnesses had seen the Toyota at that location (214). This prompted petitioner to give them "a part of the statement" (215). On direct examination, petitioner was not specific as to what "part of the statement" he provided, although he stated that he still had not told them anything about the incident on 106th Street (215).

According to petitioner's testimony, the detectives then used physical tactics to force petitioner to speak about the murder. First, Schwartz slammed petitioner, who was not yet handcuffed, against a window and pointed out that the Toyota was in police custody (215-16).

When petitioner still refused to talk, Schwartz hit petitioner in the head with the back of his hand (217). A ring on Schwartz's hand struck petitioner near the eye, opening a cut which then started bleeding (217).

Thereafter, the detectives directed petitioner to take everything out of his pockets and handcuffed him to a chair (217-18). Petitioner continued to refuse to speak about the incident on 106th Street until the detectives brought his brother into the room (218). According to petitioner, Schwartz claimed that the detectives had enough evidence to "nail" Ronnie for the murder, but would let him go if petitioner told them what happened on 106th Street (219).

Although this prompted petitioner to cooperate with the police, petitioner initially testified that he had not actually told them what happened, but simply confirmed what the police already suspected. On direct examination, petitioner testified that Grecco seemed to know what had happened "from some other statement," and wrote the statement by asking petitioner to confirm that portions of what he had learned were "right" or "good" (219-20). Petitioner denied that he ever read the completed statement or had it read to him, but admitted having signed the document (221). However, he maintained that he had not signed the statement voluntarily, stating that he signed the statement because he wanted "to get out of the room" and because, having already been struck several times, he thought "something would happen" to him if he did not sign (221).

On cross-examination, the prosecution not only inquired about whether petitioner had actually told the police certain facts set forth in the written statement, but also asked, over frequent defense objections, whether those facts were true. For example, the prosecution asked petitioner if he had told the police that he had a machete (230). When petitioner denied having done so, the prosecution was permitted to ask, over defense counsel's objection, whether

petitioner actually had a machete on the night of the incidents (230). Petitioner then admitted possessing a machete that evening (230).

In this manner, the prosecution established that many of the facts reported in the written statement were true, even though petitioner alleged that these facts had been supplied by the police and alleged that he had not signed the statement voluntarily. Petitioner testified that he never told police that he used the machete but, over defense objection, admitted on cross-examination that he had, in fact, swung it at Salerno (231). Similarly, petitioner testified over defense objection that he had struck Salerno with the machete (234-35), and that he did not tell the police that anyone else had a machete because he was the only one in possession of such a weapon (235).

Toward the end of cross-examination, the prosecutor asked petitioner to read the entire written statement to himself and to identify those portions which were not true (248). When petitioner appeared not to understand what the prosecutor wanted him to do, Justice Demakos himself took over this line of questioning (248). Justice Demakos emphasized that he wanted petitioner to identify the portions of the statement which he had not made, and not to indicate which portions were true or not true (251). When petitioner began to testify concerning what actually happened that night, the judge interrupted and reminded him, "No, I don't want to know what happened. I want to know what you told Detective Grecco" (253-54). Petitioner then testified that, although there were some inaccuracies in the statement, he had told Grecco everything about the 123rd Street incident (254). However, petitioner maintained that he had not told Grecco anything about the murder, other than that he had argued with a lady on 106th Street (254-56).

During cross-examination, petitioner admitted that he could read English (247), and that

his signatures appeared on the statement, the *Miranda* form, and the consent to search his apartment (245, 257, 260). However, petitioner claimed that he could not recall signing the *Miranda* form, and speculated that he must have unwittingly signed it, along with the many other papers presented for his signature following the interrogation (245-46). Although petitioner continued to assert that he had not voluntarily signed the statement or the consent to search (259-60), he did not testify that the statement was false. To the contrary, he implied the opposite by saying that he had not bothered to read the statement or to ask Grecco to read it to him because "I know I tell him what was in there" (258).

### The Decision

Justice Demakos credited the testimony of the three prosecution witnesses, which he found to be "candid and trustworthy," and denied petitioner's suppression motions. *People v. Ramdeo*, Ind. No. 4251-95, slip op. at 1 (N.Y. Sup. Ct. May 3, 1996). First, Justice Demakos concluded, based on the totality of the circumstances, that the police had "sufficient information to seek out and request [petitioner] to accompany them back to the precinct." *Id.* at 6. The Court found that the detectives had lured petitioner to the precinct by telling him that his brother had been in an accident, *id*. at 3, but held that this "ruse" did not "compel a conclusion of involuntariness" because petitioner did not show "that the deception was so fundamentally unfair as to deny [petitioner] due process." *Id.* at 7 (citing *People v. Tarsia*, 50 N.Y.2d 1 (1980)).

Crediting the detectives' testimony concerning the administration of *Miranda* warnings, Justice Demakos also held that petitioner had freely and voluntarily waived his *Miranda* rights prior to giving his statement. *Id.* at 7. The judge did not credit petitioner's account of abuse at the hands of the detectives and, therefore, found that the People had proved "beyond a reasonable doubt" that petitioner's statements were voluntarily given. *Id.* Petitioner's motion to

17

suppress these statements was, therefore, denied. *Id.*

Justice Demakos also denied petitioner's motion to suppress the physical evidence recovered as a result of the search of petitioner's apartment and the Toyota. The judge found that the detectives had properly obtained permission to search the apartment from both petitioner and his brother, even though either one could have authorized the search. *Id.* at 7-8. In addition, the judge found, based on Detective Schwartz's testimony about seeing blood stains inside the car, that the warrant to search the Toyota had been providently granted. *Id.* at 8.

### The Trial

In late February 1997, petitioner, represented by a new counsel, Warren M. Silverman, Esq., went on trial before Justice James E. Robinson and a jury. The People presented a total of 20 witnesses, but only half of these were eyewitnesses to either the attack on Lakeraj Ramkishun or the incident which ended with the murder of Alfred Anthony Salerno. Moreover, only two of these eyewitnesses – Yogeshwar Singh and Bhoopaul "Richie" Deonarain – could actually identify petitioner as a participant in either crime.

Yogeshwar Singh testified that he had been introduced to petitioner, whom he knew as "Mike" Ramdeo, around 1992, when Singh was home on leave from the Army (T. 411–12).[4] After Singh was discharged from the military in June 1994, he became friends with petitioner and began seeing him on a regular basis (T. 412). Singh was also acquainted with a man named Alvin, but had known him for less than a year at the time of the October 1995 incidents (T. 413).

On Saturday, September 30, 1995, Singh met petitioner at about 7:00 or 8:00 p.m. (T. 414). Petitioner drove Singh, petitioner's brother (whom Singh knew as "Rambo") and

---

[4]Numbers in parentheses preceded by a "T." denote pages in the trial transcript.

somebody named Saffras to a birthday party at 162nd Street and Hillside Avenue (T. 414-15). Although Saffras's girlfriend had reportedly been invited to the party (T. 415), none of the four individuals in the car had been invited.

At the party, petitioner and Singh became involved in a fight. Petitioner was struck in the face near or "[o]n his eye" (T. 416), and Singh was also struck (T. 457). Thereafter, the men were asked to leave and ended up driving on Liberty Avenue in Richmond Hill, Queens, where they encountered Alvin (T. 417, 458). Sometime after Alvin joined the foursome, petitioner drove his Camry back to the site of the party (T. 417, 459).

There, a doorman refused the men entry (T. 417). According to Singh, this prompted Alvin to return to the car and to retrieve a machete owned by petitioner from the trunk (T. 417, 420). The trunk was closed at the time Alvin approached the vehicle, but someone inside the car opened the trunk for him, enabling Alvin to access the machete (T. 418). Upon seeing Alvin approach with the machete, the doorman fled into the building, leaving Alvin to swing his weapon at the locked glass doors of the building (T. 419). It does not appear that Alvin succeeded in gaining entrance; he soon returned to the car and the men began cruising the streets of Richmond Hill (T. 419).

Around 10:30 or 11:00 p.m., somewhere between 123rd and 126th Street, the men heard loud music emanating from a backyard (T. 420, 460). By that time, petitioner had dropped off his brother and picked up two more men: a Trindadian man known to Singh only as "the Trinnie Kid," and "Richie" (T. 421). Some of the men, including Singh and the Trinnie Kid, decided to join the party uninvited, to the consternation of some individuals who were already at the party (T. 422). According to Singh, they "started screaming and said get out or something like that" (T. 462), and a group of ten people then chased Singh and the Trinnie Kid out of the backyard

and into the driveway (T. 422, 462-63).

According to Singh, Alvin was already outside the car when the Trinnie Kid approached it, yelling "beef, beef," with other individuals in pursuit (T. 422). Understanding the Trinnie Kid to mean that there was a fight in progress, Alvin told someone to "pop the trunk" (T. 423). Singh could not recall where petitioner was at that moment or how the trunk was opened (T. 423, 463). He testified, however, that within 15 to 30 seconds the trunk was open and Alvin had retrieved the machete (T. 424).

Alvin walked towards the driveway and struck one of his friends' pursuers with the machete (T. 464). Although the pursuer – who, like Singh, was a Guyanese man – fell to the street, Alvin continued to strike him with the machete (T. 425, 464). He stopped only when a lady, after repeatedly exhorting Alvin to stop, leaned over the fallen man to protect him with her own body (T. 425, 467). Singh did not know where petitioner was at the time of this attack, but testified that no one other than Alvin struck the man (T. 466). Alvin, Singh and the Trinnie Kid then returned to the car and resumed driving around the neighborhood (T. 426, 467).

The men eventually stopped at a sports bar at 106th Street and Liberty Avenue, where they remained, drinking beer, for three or four hours until the bar was about to close (T. 426-27, 468). As they were returning to the car, which was parked on 106th Street between Liberty and 103rd Avenues, they encountered a woman who was leaning out of the window of one of the buildings on the block (T. 427). According to Singh, one of men "said hi or something, and she cursed at them, and then somebody cursed back at her" (T. 427). About the same time, a light-skinned man carrying a garbage bag and a gym bag came down the stairs of the building and began to argue with one of the men (T. 427-28, 470).

After the argument died down, the men got back into petitioner's car (T. 429, 471). Before they could leave, however, the light-skinned man threw a bottle at them, striking the car (T. 430, 471). Petitioner, who was sitting in the front passenger seat at the time, left the car to chase the man toward Liberty Avenue (T. 431, 471). Singh could not see what, if anything, happened during the chase, but saw petitioner return to the vehicle (T. 431, 471).

After petitioner reentered the vehicle and the vehicle began pulling away for a second time, the light-skinned man threw another bottle at the car (T. 432, 471). Petitioner exited the car for a second time and chased the man "down a driveway" (T. 432, 472). Singh could not see petitioner's hands at the time (T. 432, 473), but testified that petitioner had the machete (T. 432-33). Meanwhile Alvin, who was driving, backed the car down 106th Street, striking a parked car in the process (T. 434). He "took a knife" from Singh before leaving the car, presumably to join petitioner in the driveway (T. 435, 475). Singh testified that Alvin asked him for the weapon – a three- or six-inch-long knife, attached to a set of brass knuckles – but denied that he had voluntarily given it to him (T. 436, 473-74).

After Alvin left and after Richie parked the car, the three remaining men exited the vehicle (T. 436). According to Singh, the Trinnie Kid went in the "general direction" of the driveway (T. 436), but he and Richie remained "next to the car" and did not approach the driveway (T. 436, 475). Singh heard someone other than petitioner or Alvin screaming (T. 437), then saw Alvin and petitioner leave the driveway and return to the car (T. 436). All five men got back in the car and left the scene (T. 438). After driving Richie to his house (T. 438, 477), the four remaining men drove to Singh's home, where Alvin and petitioner washed blood from their hands and clothes (T. 438, 440).

Petitioner, Alvin and the Trinnie Kid spent the night at Singh's home (T. 441). The next

morning, the four men went to the home of "Boyee," one of petitioner's cousins (T. 441-42). There, they engaged in a conversation concerning the events of the previous night. Singh was initially permitted to testify that Alvin admitted that he and petitioner had "cut the guy with a machete" and that Alvin had, thereafter, "cut his throat with the knife" (T. 443). However, when Singh stated that he was unsure whether petitioner was present when Alvin made these comments, petitioner's counsel successfully moved to strike all testimony regarding the conversation (T. 444). Later, on cross-examination, Singh again testified that, shortly after the attack, Alvin had said "he chopped the guy and slit his throat" (T. 476).

Singh was arrested on October 3, 1995 (T. 479), and was subsequently indicted on various charges, including murder in the second degree (T. 486-87). In May 1996, Singh entered into a written cooperation agreement with the District Attorney's Office, under which Singh was permitted to plead guilty to criminal facilitation in the second degree, a class C felony (T. 495-96). Under the agreement, Singh was not promised any particular sentence; rather, he was informed of a range of possible sentences (T. 492) and was told that "the sentencing judge might give a lighter sentence" if he cooperated with the prosecution (T. 448). Singh admitted that he had engaged in plea-bargaining on a prior occasion, following a December 1992 arrest for possession of a loaded gun (T. 449, 487). Singh pled guilty to criminal possession of a weapon in the fourth degree, a misdemeanor, and was sentenced to one year of unsupervised probation (T. 449-50, 488).

Bhoopaul "Richie" Deonarain, who was 19 years old at the time of trial, was petitioner's cousin, but nonetheless knew him only by his nickname, "Mike" (T. 1233-34). Deonarain's testimony was largely consistent with Singh's, but differed in some respects.

Like Singh, Deonarain recalled going to a party with petitioner sometime after 8:00 p.m. on September 30, 1995, at which petitioner became involved in a fight (T. 1236). However, Deonarain and Singh did not agree on the number or identity of the people who left the party with petitioner. While Deonarain recalled that Singh, whom he knew as "Sun," was one of them, he testified that there were four people – not three – with petitioner, and that petitioner's brother was not among them (T. 1236-37). Deonarain also recalled that petitioner "took some beating at the party," leaving marks – including a black mark – and scratches on his face (T. 1237).

According to Deonarain, petitioner picked up his brother and Alvin after leaving the party, somehow fitting all seven men into petitioner's Camry (T. 1238-39). Unlike Singh, Deonarain did not testify concerning any attempt to return to the party at which petitioner had been beaten or about any incident involving a doorman. Rather, he testified that Alvin suggested going to a party that was being held in his neighborhood, somewhere between 123rd and 125th Streets (T. 1239).

Although Alvin allegedly said he knew the hosts, he remained in the car while four of his friends – including Singh and someone Deonarain identified only as "the Trinidadian guy" – entered the party (T. 1240). Like Singh, Deonarain recalled seeing a group of people chase the Trinidadian man from the party a few minutes later (T. 1275). The Trinidadian man ran towards the car, saying, "we got beef in the party," or something to that effect (T. 1241). Alvin responded by saying, "Pop the trunk" (T. 1241). Deonarain, like Singh, purported not to know how the trunk was opened, but testified that petitioner was in the driver's seat at the time (T. 1242, 1276). Deonarain saw Alvin retrieve the machete from the trunk, saw him swing it at a man who ran up to him, and saw the man fall down in the middle of the street (T. 1243, 1276).

Immediately after Alvin removed the machete from the trunk, petitioner drove the car

down the block (T. 1276).  Deonarain, too, fled the scene just as Alvin began to swing the

machete (T. 1243).  Deonarain ran back to the car, and was followed shortly thereafter by Alvin,

Singh and the Trindadian man (T. 1244).  After the four men piled into the Camry with petitioner

and his brother, petitioner drove away (T. 1244).  Petitioner dropped his brother off at his home,

but ignored Deonarain's requests to be driven home as well (T. 1245).  Instead, petitioner drove

to the sports bar at 106th Street and Liberty Avenue (T. 1245).

Deonarain estimated that the five men remained at the sports bar for "around an hour" –

not three or four – before walking back towards the car (T. 1245).  Deonarain recalled seeing one

or two girls in the window of a building that they passed, and remembered that one of the men

had asked one of the girls if she wanted to "have a good time" (T. 1246).  Unlike Singh,

Deonarain testified that the women did not respond, but that a white man who came downstairs

around that time confronted them and began arguing with petitioner (T. 1247-48).  Deonarain

recalled that the argument ended when petitioner started chasing the man (T. 1248).  The man

dropped the two bags he had been carrying and fled "towards . . . the middle of the road," and

petitioner soon returned to the car (T. 1248).

Once the five men were inside the vehicle, petitioner began to drive away.  He may have

driven as far as halfway down the block before something struck the car (T. 1249).  According to

Deonarain, petitioner stopped, but no one saw who threw the object, so no one left the car at that

time (T. 1249)   However, at Alvin's suggestion, petitioner drove around the block and down the

same street a second time, at which point a bottle struck petitioner's car (T. 1249).

This time, the Trindadian man was able identify the location from which the bottle was

thrown (T. 1250).  Deonarain testified that Alvin gave chase initially, and that petitioner left the

car only after Alvin ran into the alleyway (T. 1250).  However, Deonarain claimed that petitioner did not run directly after Alvin, but went in a different direction (T. 1251).  Singh and the Trindadian man also exited the car and, upon hearing noise and seeing light emanating from a backyard, went in the direction of the light (T. 1251-52).

Left alone with the car, Deonarain attempted to drive the car farther up the block (1253).  The car had a manual transmission and Deonarain, who did not know how to use a stick shift, was unable to go very far before it stalled (T. 1253).  Thereafter, Deonarain remained with the car (T. 1254).

Deonarain heard "some banging around" and heard a voice he did not recognize yelling for help (T. 1274-75).  Deonarain, who saw Alvin pull the machete from his pants as he started chasing the man (T. 1289), testified that Alvin also had a knife, which Deonarain had seen Singh give Alvin earlier that day (T. 1252).  However, Deonarain did not witness the attack on Salerno and, therefore, did not know who, if anyone, had used either of the weapons.  Deonarain claimed on direct examination that, because all four men returned to the car at the same time, he could not see who had carried the machete back to the car (T. 1254).  Yet, after defense counsel impeached Deonarain with a portion of his grand jury testimony, Deonarain recalled that Alvin had been carrying the machete when the men returned to the car (T. 1279-80).

The five men then drove away (T. 1259-60).  Alvin removed his long-sleeved shirt, which had blood on the sleeve, and threw it in the back of the car (T. 1264, 1280-81).  Deonarain also observed spots of blood on petitioner's white T-shirt and blood on the pants worn by the Trinidadian man (T. 1264-65).  Everyone was talking at once, so Deonarain did not understand much of what they were saying (T. 1265).  However, he did hear Alvin claim that he "got the

guy" (T. 1266).   The men then drove Deonarain to his home, when he parted company with them (T. 1268).

Deonarain was arrested sometime on Monday, October 2, 1995 (T. 1270, 1273).  He spent a night at the precinct, but was released the next day (T. 1278).  A few days after the incident, Deonarain testified for the prosecution before the grand jury (T. 1278-79).

None of the eight other eyewitnesses who testified on behalf of the prosecution were able to identify petitioner.  Lakeraj Ramkishun testified that, on the night of September 30, 1995, his family held a party in the backyard of their 123rd Street home (T. 528).  Lakeraj recalled seeing a group of about five men with whom he was not acquainted join the party, but did not recall seeing anyone chase them away (T. 533, 535-36).  About ten minutes later, while returning to the party after smoking a cigarette in the driveway, Lakeraj was felled by a blow to the back of the head (T. 529).  It is unclear whether Lakeraj immediately lost consciousness (*compare* T. 529-30 *with*  T. 536-37), but Lakeraj testified unequivocally that he did not know who hit him (T. 535).

Lakeraj's mother, Sanchry Ramkishun, recalled that about six men had arrived uninvited and that Lakeraj "told them two times [to] kindly leave" before one of the men struck Lakeraj with a stick (T. 370, 388).  She further testified that two men then kicked Lakeraj in the face while a third retrieved a machete from the trunk of a white car (T. 370-71, 389-90).  This man then struck Lakeraj twice in the head with the machete before Sanchry jumped in front of or on top of her son, begging for his life (T. 371, 392).  The men then jumped in the car and left the scene (T. 371, 375).  Sanchry testified that she would be unable to recognize the man with the machete (T. 397), and was completely unable to describe any of the men, stating that she did not even know their race, height or weight (T. 385-86).

The six other eyewitnesses all observed portions of the incident which culminated in

Salerno's murder. Margaret DeStefano testified that she was at her kitchen sink, near a second-floor window facing 106th Street, when four men yelled "obscenities" at her through the open window (T. 762-63). Although she claimed not to remember exactly what they said, DeStefano testified that she responded by saying, "maybe with your mother but not with me" (T. 763-64). Shortly thereafter, she heard something crashing against her window (T. 764). Believing that the men were throwing bottles and may have broken her window, DeStefano yelled to the other two occupants of her apartment – a woman named Mary and Salerno, whom DeStefano referred to as "Freddie" – to "get down" (T. 764). DeStafano then called the police from a back bedroom (T. 764). By the time she emerged from the bedroom, Freddie had left the apartment (T. 764).

DeStefano did not see Freddie leave, and did not see him on the street or fighting with anyone (T. 774). DeStefano remained in her apartment until she saw two ambulances arrive (T. 767). At that point, she "got a bad feeling" and ran downstairs, where she learned from one of the ambulance drivers that Freddie was in an ambulance (T. 767-68). DeStefano subsequently spoke to a detective, and identified a pair of shorts which were lying in the street as belonging to Freddie (T. 769). DeStefano was unable to describe the four men she had seen except to say that they appeared to be Indian (T. 776-77), and had been near a white car (T. 764).

Norma Chauca testified that she lived on the second floor of 103-21 106th Street and was awakened on October 1, 1995, by noises coming from outside (T. 651-52). At first, she saw nothing outside, but subsequently heard voices and looked through the window to see two men, one of whom was holding a shiny, long knife (T. 652-53). They appeared to be looking for someone (T. 654). Thereafter, a white car, which Chauca thought "looked like a Toyota," pulled up and the men got in and drove away (T. 654-55).

A short time later, Chauca noticed a white man in the backyard of a nearby house (T. 655). Chauca testified that he appeared frightened and picked up two bottles before heading back toward the street (T. 655-66). However, as he was walking toward the street, the white car returned (T. 656). When a man stepped out of the car, the white man threw the bottles, striking the car (T. 666). The man from the car then chased the white man into the yard, followed by three other men (T. 657). After she heard screaming, and saw one of the men try unsuccessfully to start the white car, Chauca called the police (T. 657). She saw nothing further and could not identify the men from the car, whom she described as "Hindu Indians" (T. 658). However, she was able to give the police the first few digits of the license plate on the white car (T. 659).

Jessica Travers testified that she was a passenger in a car traveling down 106th Street at around 2:00 or 3:00 a.m. on October 1, 1995 (T. 786-87). Near the corner of Liberty Avenue, she observed a white man and a group of Indian men "running around" (T. 787-88). The white man appeared to be "dodging," and several Indian men were standing near a white car which was parked on the right side of the street (T. 787-88).

While the car in which she was riding was stopped for a red light at the intersection of 106th Street and 103rd Avenue, Travers saw the white car speed up and stop behind hers (T. 789). She then saw the white man approach the car on foot and throw something at it (T. 793). Travers heard "a big thump" and saw all of the occupants, except the driver, jump out of the white car (T. 789). The car then backed up the block, roughly to the spot at which it had been parked when Travers first saw it (T. 790). However, Travers was not able to identify any of the men involved.

Muneshwar Ganesh and Timothy Quirk were the only two witnesses to the attack on Salerno, but neither could identify any of the perpetrators. Ganesh, who lived on the second floor of one of the houses next to the driveway or alleyway where the incident occurred, testified

that he was awakened around 3:00 or 4:00 a.m. on October 1, 1995, by a "big noise" (T. 631). After looking out the side window onto the alleyway and observing nothing, he looked out the back window and saw three or four men fighting in the backyard (T. 631). One man was bent over, holding his left arm above his shoulder and making a downward motion (T. 632). Another man, who appeared to have a machete or a cutlass (T. 633, 644), was standing up, holding his right arm above the shoulder and making a downward motion (T. 633). Yet another man was screaming for help, so Ganesh called "911" (T. 632). Ganesh spent around three minutes telephoning the police, then looked outside again in time to see "everybody" running from the backyard, through the driveway and onto 106th Street (T. 635). Ganesh could not provide a description of any of these individuals (T. 636). One man remained on the ground in the driveway next to the house (T. 636).

Timothy Quirk, who lived in a first-floor apartment directly across 106th Street from the entrance to the driveway (T. 621), was also awakened around 4:00 a.m. on the morning of October 1, 1995, by loud noises (T. 614-15, 624). He looked out the window and saw four or five people chase a man into the driveway, where they began to beat him (T. 615). One man swung something, which Quirk thought was a bat, about 15 times, while the remaining assailants kicked the man as he lay on the ground (T. 615). As Quirk watched, a white car backed up and four or five people left the driveway (T. 617). Quirk did not call the police (T. 624), but crossed the street and observed a person on the ground in a pool of blood (T. 618). Quirk could not describe the assailants, except to say that they appeared to have "dark" or "tannish" skin (T. 621).

Carmen Sotomayor, who was waiting for her son to return home at around 4:00 on the

29

morning of October 1, 1995, testified that she heard tires squealing on a car which was being moved back and forth on 106th Street in front of her home (T. 798-99).  She looked out her front window onto 106th Street and saw a cream-colored car, with several doors open and someone in the driver's seat (T. 799).  She also heard the sound of someone being hit (T. 803).

The car left shortly after her son arrived (T. 800).  Thereafter, she saw three or four dark-skinned men run out of the alleyway and toward 103rd Avenue (T. 801, 804).  Moving to her side window, she peered into the alleyway, where she saw blood and a man lying on the ground (T. 803, 805).

Aside from the eyewitnesses, the prosecution introduced testimony from three expert witnesses and six police officers.  One of the expert witnesses, Dr. Jacqueline Lee, testified that she was a Deputy Chief Medical Examiner who supervised another doctor during his autopsy of Salerno (T. 993, 1000).  She observed a total of 34 incised and stab wounds to Salerno's body, including a five-inch-long, incised-type wound which penetrated Salerno's skull (T. 1002-03, 1030).  Dr. Lee opined that this wound, which bruised Salerno's brain and resulted in bleeding around his brain, caused his death (T. 1003, 1033-34), and that the curved part of the machete was "consistent with the curved characteristics of the wounds . . . on the head" (T. 1014).  However, other wounds on the body were not caused by the machete, but by a blade measuring three-quarters of an inch in width (T. 1026).

The other two expert witness were Mary Shenouda, an analyst in the Medical Examiner's Office, who was qualified as an expert in forensic analysis, and Detective Eileen Barrett, an expert in fingerprint identification.  Shenouda testified concerning her analysis of blood found on the machete and items removed from the Toyota.  She concluded that there were human blood

stains on the machete (T. 1153), and blood stains on a piece of plastic molding – Exhibit 18-A –
which had been removed from the side of the Toyota's driver's seat (T. 1174-75).  Shenouda
testified that a control sample of seat material removed from the car did not contain blood (T.
1163), but was precluded, because of chain-of-custody problems, from testifying about a stained
sample which had been removed from the same seat (T. 1163-65).

Barrett testified that she compared certain fingerprints found at the crime scene with
those of Salerno, petitioner, and other suspects (T. 1213).  Barrett found no evidence to link
petitioner to the crime (T. 1217-19).

The police witnesses testified, *inter alia*, about the inculpatory statement which petitioner
had allegedly given to Detective Grecco.  Detectives Grecco, Schwartz, and Annunziata offered
testimony that was substantively similar to their testimony at the suppression hearing.  Over the
objection of petitioner's trial counsel, the Court received in evidence the three-page, handwritten
statement in which petitioner admitted that he had struck Salerno with the machete (Grecco: T.
561).

At the close of the People's case, defense counsel moved for a trial order of dismissal,
asserting that Alvin had both assaulted Ramkishun and possessed the machete during the attack
on Salerno, and arguing that there was insufficient proof that petitioner acted in concert with
Alvin (T. 1291-92).  After that motion was denied, defense counsel conferred with petitioner
before announcing:

> I have just conferred with the defendant, and he has indicated to
> me that he does not wish to testify, thusly, . . . the defense will call
> no witnesses.

(T. 1294).  Defense counsel then read a stipulation, which introduced a prior inconsistent
statement relating to DeStefano's testimony, to the jury before resting on the record (T. 1297).

***The Summations***

In his summation, defense counsel argued that the People had failed to prove petitioner's guilt beyond a reasonable doubt. After reminding the jury of the presumption of innocence, defense counsel reviewed the testimony of most of the prosecution witnesses. Defense counsel did not contest that the crimes had taken place, but noted that the testimony of most of the prosecution witness did not implicate petitioner in the crimes.

Defense counsel suggested that Singh and Deonarain – the two witnesses who had identified petitioner as a participant in Salerno's murder – had ample motive to fabricate their testimony inculpating petitioner. He pointed out that Singh, himself, had been indicted for Salerno's murder, but had been permitted to plead guilty to a lower charge in exchange for his testimony. Defense counsel further noted that Singh could receive as little as probation under the plea, and expected "that his sentence will be determined by how good a job he does testifying" (T. 1326). Referring to Singh's testimony as "bought and paid for" (T. 1356), defense counsel implied that Singh was employing the same strategy he had successfully used following his December 1992 arrest for possession of a loaded handgun, saying:

> What did he do back then? The same thing he did here. He plea bargained the case down and got a walk, but we didn't hear what he did in return for that.

(T. 1327). When objection to this comment was sustained, defense counsel nevertheless continued in a similar vein, saying:

> [H]e walked away from the gun just like he is trying to walk away from this murder case. He did it once, and now it's done twice. You got to think about . . . why it was so important to make a deal with him to get him to come in here and testify because there is so little real evidence in this case.

(T. 1328).

Defense counsel used a similar strategy in an effort to discredit Deonarain, noting that Deonarain, too, had been charged with Salerno's murder and implying that these charges had been dismissed in exchange for Deonarain's agreement to testify for the prosecution (T. 1354). However, defense counsel urged the jury to credit certain portions of Deonarain's testimony, such as his testimony that Alvin was in possession of both the knife and machete at the time he left the Toyota in pursuit of Salerno (T. 1355). Defense counsel noted that Deonarain had remained with the Toyota and was not a witness to Salerno's murder, but argued that Alvin, who "had the blood thirst that night" and "had the means" to murder Salerno, was solely responsible for the crime (T. 1358).

Defense counsel also sought to discredit the testimony concerning petitioner's alleged statement. He made no effort to argue that the statement was coerced, but argued instead that the inculpatory portions had been fabricated by Grecco. Defense counsel noted that the first two pages of the statement contained "innocuous" facts, and that the portion describing the murder itself contained very little detail (T. 1334). Defense counsel asserted that the lack of detail suggested that petitioner "didn't say that he touched . . . Salerno" and implied that Grecco included a lengthy recitation of innocuous facts in the hope that petitioner would sign the statement without reading the inculpatory material on the third page (T. 1334). Defense counsel also noted that Schwartz's testimony and police records contradicted Grecco's claim that petitioner had been arrested as late as 11:30 a.m. on October 2, 1995, and encouraged the jury to completely disregard Grecco's testimony under the principle of *falsus in uno* (T. 1335-36). Defense counsel also argued that there was no evidence that any blood had been found in the Toyota (T. 1348).

The prosecution began its summation by reminding the jury that it did not have to "come to a conclusion as to exactly what transpired" on the morning of October 1, 1995, but needed to determine only whether petitioner had been proven guilty beyond a reasonable doubt (T. 1378). In furtherance of that argument, the prosecution expressly responded to defense counsel's suggestion that Alvin could have perpetrated the crime and that petitioner had been made a "scapegoat" (T. 1379). The prosecutor noted that, even after obtaining evidence of Ronnie's involvement, the police continued the investigation which ultimately exonerated Ronnie, and argued that if the police had merely sought a "scapegoat," they would not have done so (T. 1379-80).

In the course of his summation, the prosecutor attempted to explain away discrepancies in the evidence. For example, he argued that Grecco's testimony concerning the time at which petitioner was brought to the precinct was more credible than that of Schwartz, "who had to look at his notes to give . . . the name of [petitioner] as well as other items" (T. 1386). However, the prosecutor admitted that there was some truth to defense counsel's claims that the police work had been sloppy, saying, "I'm not going to tell you that it's the most greatest case in terms of investigation." (T. 1413). Nonetheless, the prosecutor suggested that it was unreasonable to expect perfection on the part of the police, stating, "You can't compare this [to] television. This is reality." (T. 1413). Addressing defense counsel's suggestion that the prosecution had not adduced any evidence concerning the blood stains in the Toyota, the prosecutor reminded the jury that Shenouda had testified concerning two of the three samples removed from the car, and asked the jurors not to speculate as to why there was no testimony concerning the third sample (which had been precluded by the trial court due to chain-of-custody problems) (T. 1390).

The prosecution directly addressed defense counsel's arguments that petitioner's statement had been fabricated or that evidence had been planted in petitioner's apartment. The prosecutor argued that there was nothing suspicious about the lack of detail on the third page of petitioner's statement, suggesting that an experienced detective like Grecco could have concocted a far more detailed account if he had wanted to (T. 1388-89). The prosecution also argued that defense counsel's suggestion that evidence was planted in petitioner's apartment ignored that fact that Ronnie was present during the search, saying:

> Defense counsel is trying to have you believe and he actually came out and said that the items were planted. * * * Does this make any sense? If you buy that, where is Ronnie? Ronnie was with the detectives when they searched the residence.

(T. 1392-93).

The prosecution countered defense counsel's claim that Deonarain had a motive to falsely inculpate petitioner by reminding the jury that Deonarain was petitioner's first cousin and was testifying in front of other family members (T. 1399). The prosecutor conceded that there was no direct evidence that petitioner had intended to kill Salerno, or that petitioner had acted in concert with others, but asserted that the circumstantial evidence was sufficient to make out these elements. With respect to acting in concert, the prosecution acknowledged that there was no testimony that any conversation took place between the alleged perpetrators prior to the attack on Salerno, but asserted that conversation was unnecessary because the perpetrators all knew their roles. At first, the prosecutor sought to analogize the perpetrators to soldiers, stating:

> There is no testimony about any conversation. Is there any need?
> Was this any different than an attack by a squad of soldiers?

(T. 1409). Defense counsel's objection to that analogy was sustained (T. 1409), but the Court permitted the prosecutor, over objection, to use a baseball analogy:

| ADA Warsawsky: | [Y]ou are out in the outfield, and the ball comes to you. Do you work independently of your fellow players on the team or do you work – |
|---|---|
| Mr. Silverman: | Objection. |
| The Court: | Overruled. |
| ADA Warsawsky: | – as a group? Do you think there had to be an exchange of words and ideas, or what you heard from all the witnesses was this a group attack with a common object. |

(T. 1409-10).

With respect to the perpetrators' intent, the prosecutor relied on testimony concerning the nature of the injuries to Salerno. The prosecutor noted that Salerno had been struck in the head and torso and asserted, "There is only one purpose in doing that" (T. 1406). He then further argued:

> The bruises on [Salerno's] face also indicate an intent to injure. All the bruises were in the facial area, and you saw that he did not go down without a fight, that there were injuries consistent with him having defended himself, the bruising on the knuckles which I submit to you only incensed the attackers –

(T. 1407). After defense counsel's objection to this argument was overruled, the prosecutor concluded by stating:

> The audacity of the deceased fighting back and not allowing these people to do whatever they want to do upon him.

(T. 1407).

### The Charge, the Verdict and the Post-Conviction Proceedings

Defense counsel elected not to request that the trial court charge the jury on any lesser included offenses (T. 1301), and the prosecution elected to dismiss three of the nine counts in the indictment (T. 1300). The court charged three counts of murder in the second degree:

intentional murder and depraved-indifference murder, which were submitted in the alternative, and one count of felony murder on the theory that petitioner was intending to rob Salerno at the time he was killed. The trial court charged the jury on attempted murder in the second degree on the theory that petitioner had intentionally attempted or aided in attempting to kill Ramkishun; robbery in the first degree on the theory that petitioner or others with whom he acted in concert had robbed Salerno of his gym bag and wallet; and assault in the second degree in connection with the attack on Ramkishun.

On March 18, 1997, the jury returned its verdict, finding petitioner not guilty of all charges except murder in the second degree under a depraved-indifference theory, N.Y. Penal Law § 125.25(2), and assault in the second degree, N.Y. Penal Law § 120.05(2). On appeal, petitioner's counsel principally argued that the evidence was insufficient to support the assault conviction and that the trial court should have suppressed petitioner's written statement both because it was involuntarily made and as a fruit of an unlawful arrest. Appellate counsel did not contest the sufficiency of the evidence relating to the murder conviction, or argue ineffective assistance of trial counsel.

On September 21, 2000, the Appellate Division, Second Department, modified the judgment of conviction to the extent of vacating petitioner's assault conviction and dismissing that count of the indictment. *People v. Ramdeo*, 277 A.D.2d 258, 719 N.Y.S.2d 252 (N.Y. App. Div. 2d Dep't 2000). The Appellate Division held that there was no evidence that petitioner, who remained in his car during the assault on Ramkishun, intended to cause physical injury to Ramkishan. *Id.*, 277 A.D.2d at 258, 719 N.Y.S.2d at 253. However, the Appellate Division rejected petitioner's argument that his written statement should have been suppressed, stating, "[t]he totality of the circumstances indicates that the . . . statement was made voluntarily." *Id.*,

277 A.D.2d at 258, 719 N.Y.S.2d at 252.  The Court did not specifically address the issue of whether the statement was the fruit of an unlawful arrest, but stated that petitioner's "remaining contentions" were "without merit."  *Id.*, 277 A.D.2d at 258, 719 N.Y.S.2d at 253.  The New York Court of Appeals denied leave to appeal on May 10, 2001.  *People v. Ramdeo*, 96 N.Y.2d 833, 729 N.Y.S.2d 454 (2001), and, after reconsideration, denied leave a second time on December 17, 2001.  *People v. Ramdeo*, 97 N.Y.2d 687, 738 N.Y.S.2d 302 (2001).

On January 24, 2002, petitioner filed a *pro se* motion to vacate his conviction pursuant to New York Criminal Procedure Law § 440.10 (hereafter, the "§ 440 motion"), in which he principally argued that his trial counsel had provided ineffective assistance.  Petitioner faulted the attorney who represented him prior to trial for failing (1) to inform petitioner of his rights under the Vienna Convention on Consular Relations, *done* Apr. 24, 1963, art. 36, 21 U.S.T. 77, or to seek suppression of petitioner's statement under this theory; (2) to adequately prepare for the pre-trial suppression hearing by failing both to investigate and to call any witnesses other than petitioner and his brother; and (3) to adequately prepare petitioner to testify at the hearing and then failing to object to "prejudicial questions."  Petitioner's Affidavit in Support of Motion to Vacate Judgment at 32.  Petitioner also faulted the attorney who represented him at trial for failing (1) to interview or to call any witnesses at trial or to pursue a coherent strategy; (2) to request that the trial court charge the jury on any lesser included offenses, and (3) to "bring to light" the violations of petitioner's rights under the Vienna Convention.  *Id.* at 42.  However, petitioner's § 440 motion did not argue that the evidence was insufficient to sustain his murder conviction or that trial counsel's failure to raise this point constituted ineffective assistance.  Petitioner's motion was denied on March 11, 2003.  *People v. Ramdeo*, Ind. No. 4521/95, slip op. (N.Y. Sup. Ct. Queens County Mar. 11, 2003).

On June 26, 2003, petitioner filed a *pro se* petition for a writ of error coram nobis with the Appellate Division, Second Department, alleging ineffective assistance of appellate counsel. Petitioner asserted, *inter alia*, that appellate counsel had failed to argue that "there [was] no rational basis upon which a jury could have found [him] guilty of depraved mind murder beyond a reasonable doubt." Ramdeo's Affidavit in Support of Motion for a Writ of Error Coram Nobis at 19. The Appellate Division denied petitioner's application, holding that petitioner had failed to establish that he was denied the effective assistance of appellate counsel. *People v. Ramdeo*, 1 A.D.3d 537, 767 N.Y.S.2d 243 (N.Y. App. Div. 2d Dep't 2003). On February 27, 2004, the New York Court of Appeals denied petitioner leave to appeal this decision. *People v. Ramdeo*, 1 N.Y.3d 633, 777 N.Y.S.2d 31 (2004).

On March 10, 2004, petitioner filed the instant *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner raised five grounds: ineffective assistance of trial counsel, ineffective assistance of appellate counsel, and three grounds regarding the admissibility of petitioner's statement to the police. The petition did not contain a statement of facts or any new arguments in support of these grounds. Indeed, rather than describe the facts supporting his two ineffective assistance claims, petitioner simply referred to pages in his affidavits in support of his § 440 motion and his petition for a writ of error coram nobis, and to pages in his replies to the People's responses to those applications. Petition at 5.

During oral argument on October 29, 2004, this Court requested that the parties file supplemental submissions relating solely to the question of whether the trial court's determinations concerning the voluntariness of petitioner's statements to the police were entitled to deference in light of *Miller v. Fenton*, 474 U.S. 104 (1985). *See* Transcript of Oct. 29, 2004, Oral Argument at 4-6. On December 21, 2004, petitioner retained counsel for the purpose of

preparing the supplemental submission requested by the Court. In a submission dated February 25, 2005, petitioner's counsel not only addressed the issue raised at oral argument, but also sought permission to amend the petition to add the argument that "trial counsel was ineffective for failing to argue that the evidence was insufficient to support the charge of depraved-indifference murder." Letter to Hon. Sandra L. Townes from Andrea G. Hirsch, Esq., dated February 25, 2005, at 1. On May 4, 2005, after petitioner's application to amend the petition on this ground had been fully briefed by the parties, petitioner's counsel requested permission to add yet another, related argument to the petition: "that [petitioner's] conviction should be vacated because he is innocent of depraved-indifference murder." Letter to Hon. Sandra L. Townes from Andrea G. Hirsch, Esq., dated May 4, 2005, at 1. This Court denied petitioner's application to amend the petition, noting that the ground which petitioner proposed adding to his petition was not yet exhausted and that petitioner could not establish "good cause" for staying these proceedings until the ground was exhausted. *See Ramdeo v. Phillips*, No. 04-CV-1157 (SLT), 2006 WL 297462, at *4-*7 (E.D.N.Y. Feb. 8, 2006).

## DISCUSSION

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman*, 261

F.3d 303, 313 (2d Cir. 2001) (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir. 1999)).

Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court

arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if

the state court decides a case differently than [the Supreme] Court has on a set of materially

indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000) (O'Connor, J.,

concurring and writing for the majority in this part).

Under the "unreasonable application" clause, "a federal habeas court may grant the writ

if the state court identifies the correct governing legal principle from [the Supreme] Court's

decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

Under this standard:

> [A] federal habeas court may not issue the writ simply because that
> court concludes in its independent judgment that the relevant
> state-court decision applied clearly established federal law
> erroneously or incorrectly. Rather, that application must also be
> unreasonable.

*Id.* at 411. In order to grant the writ, there must be "[s]ome increment of incorrectness beyond

error," although "the increment need not be great; otherwise, habeas relief would be limited to

state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v.*

*Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

### *The First Ground for Habeas Relief – The Volunatiness of Petitioner's Statement to Police*

In his first ground for habeas relief, petitioner argues that the hearing court erred in

finding that the prosecution had proved beyond a reasonable doubt that his written statement was

voluntarily given, and that admission of this statement thus violated his Fifth and Fourteenth

Amendment rights against self-incrimination. "The police may use a defendant's confession

[obtained during a custodial interrogation] without transgressing his Fifth Amendment right only

when the decision to confess is the defendant's free choice." *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997) (bracketed material in original) (quoting *United States v. Anderson*, 929 F.2d 96, 98 (2d Cir. 1991)). The prosecution has the burden of proving by a preponderance of the evidence that a confession was voluntary. *Id.* (quoting *Anderson*, 929 F.2d at 99).

The voluntariness of a state habeas petitioner's confession is "a legal question requiring independent federal determination" under the review provisions of § 2254(d)(1). *Miller v. Fenton*, 474 U.S. 104, 110 (1985); *see Thompson v. Fischer*, Nos. 02-CV-0526 (JBW), 03-MISC-0066 (JBW), 2003 WL 23198787, at *15 (E.D.N.Y. Oct. 31, 2003). The findings underlying the State court's voluntariness determination, however, are factual determinations which "must be 'presumed to be correct in a federal habeas corpus proceeding.'" *Thompson*, 2003 WL 23198787, at *15 (quoting 28 U.S.C. § 2254(e)(1)). This presumption applies to such determinations as "the length and circumstances of the interrogation," *Miller*, 474 U.S. at 117, and "whether in fact the police engaged in the intimidation tactics alleged" by the petitioner. *Id.* at 112; *see Nelson*, 121 F.3d at 833. The presumption of correctness may be set aside if "the material facts were not adequately developed at the State court hearing or . . . the factual determination is not fairly supported by the record," *Nelson*, 121 F.3d at 833 (quoting *Pagan v. Keane*, 984 F.2d 61, 64 (2d Cir. 1993)), but the petitioner bears the burden of rebutting the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

In this case, petitioner has not established by clear and convincing evidence that Justice Demakos's factual determinations were not supported by the record. Petitioner correctly observes that the record contains evidence, largely in the form of testimony from petitioner and his brother, from which Justice Demakos could have found that petitioner was not advised of his

*Miranda* rights and was physically intimidated into giving and signing his written statement. *See* Affidavit and Memorandum of Law Replying to Respondent's Opposition to Petition ("Reply Memo") at 10-11; Letter to Hon. Sandra L. Townes from Andrea G. Hirsch, dated Feb. 25, 2005, at 1-5. However, petitioner does not, and cannot, deny that there was also evidence to the contrary. Detective Grecco testified that he advised petitioner of his *Miranda* rights prior to the interrogation (101-03), and a signed *Miranda* form was admitted in evidence (102-03). Detective Grecco further testified that, after signing the form, petitioner "gave the statement on his own" (129). Both Detective Grecco and Detective Schwartz denied striking, or seeing any other officer strike, petitioner (Schwartz: 81; Grecco:112, 129-30).

Justice Demakos, who found the detectives' testimony to be "candid and trustworthy," Hearing Decision at 1, credited the detectives' testimony over that of petitioner and his brother. The judge found that Grecco "properly administered each and every *Miranda* warning" prior to any conversation with petitioner, and that petitioner "affirmatively waived" his *Miranda* rights. *Id.* at 6. On the other hand, Justice Demakos did not credit petitioner's claim that his statement was coerced by physical and mental abuse, stating that "the credible evidence adduced, including the photograph of the defendant at the time his statement was made, belie[d] the defendant's allegations." *Id.* at 7.

Petitioner does not provide clear and convincing evidence that the detectives' testimony was incredible as a matter of law. He also fails to suggest any reason why Justice Demakos could not credit the detectives' testimony over that of petitioner and his brother. Therefore, this Court must presume that Justice Demakos's factual determinations as to when and how the *Miranda* warnings were administered and as to "whether in fact the police engaged in the

intimidation tactics alleged" by petitioner are correct.  *See Nelson*, 474 U.S. at 112.

In light of these factual determinations, this Court concludes that petitioner's written statement was voluntarily made.  In evaluating voluntariness, the factors to be considered include:

> the characteristics of the accused, such as his experience, background, and education; the conditions of the interrogation; and the conduct of law enforcement officials, notably, whether there was physical abuse, the period of restraint in handcuffs, and use of psychologically coercive tactics.

*Nelson*, 121 F.3d at 833. *See also Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989) ("Relevant facts that should be considered include the accused's age, his lack of education or low intelligence, the failure to give *Miranda* warnings, the length of detention, the nature of the interrogation, and any use of physical punishment.").  "No single criterion controls whether an accused's confession is voluntary; whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances."  *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988).

Although petitioner in this case was a citizen of Guyana and only 19 years old at the time of his interrogation, he testified that he could read English and was able to testify both at the hearing and trial without the aid of an interpreter.  There is nothing to suggest that petitioner, who had been arrested only once before, was particularly well-acquainted with the criminal justice system.  However, Justice Demakos found that Detective Grecco read petitioner the *Miranda* warnings prior to his interrogation and that petitioner confirmed, both verbally and in writing, that he understood his rights.

The interrogation itself was neither particularly long nor arduous.  Justice Demakos

found that petitioner arrived at the precinct between 10:30 and 11:00 a.m., and that the interrogation concluded at approximately 2:50 p.m. Hearing Decision at 3, 4. During the interrogation, petitioner was permitted to leave the interview room to use the bathroom and was provided with something to drink. Although he was not provided with food, there is nothing to suggest that he ever asked for any.

In addition, as previously noted, Justice Demakos found that petitioner had not been subjected to any physical or psychological abuse. Grecco denied that petitioner was handcuffed at any point during the interrogation (Grecco: 138). Although Schwartz recalled that petitioner may have been handcuffed at some point during his stay in the interview room (84), Schwartz did not recall precisely when petitioner was handcuffed (87), but believed that petitioner was not handcuffed until he was arrested (72-73).

Based on a careful evaluation of the totality of the circumstances surrounding petitioner's confession, this Court concludes that petitioner's written statement was voluntarily made. Accordingly, this Court finds no merit to petitioner's first ground for habeas relief.

### The Second Ground – The Alleged _Dunaway_ Violation

As a second ground for habeas relief, petitioner argues that the hearing court should have suppressed plaintiff's statement as a fruit of his unlawful arrest. Petitioner implies that the hearing court's decision was contrary to clearly established Federal law, as determined by the Supreme Court in _Dunaway v. New York_, 442 U.S. 200 (1979) – a case which held that statements given by a suspect who is arrested without probable cause must be suppressed. Under _Dunaway_, such statements are suppressed pursuant to the "exclusionary rule," which is used to effectuate the Fourth Amendment, and without regard to whether such statements are voluntarily

made.

In *Stone v. Powell*, 428 U.S. 465 (1976), however, the Supreme Court explained that the considerations which support the implementation of the exclusionary rule at trial and its enforcement on direct appeal of state-court convictions do not require extension of the exclusionary rule to the habeas context. The *Stone* Court found "no reason to believe . . . that the overall educative effect of the exclusionary rule would be appreciably diminished if search-and-seizure claims could not be raised in federal habeas corpus review of state convictions," and no "reason to assume that any specific disincentive already created by the risk of exclusion of evidence at trial or the reversal of convictions on direct review would be enhanced if there were the further risk that a conviction . . . might be overturned in collateral proceedings." *Id.* at 493. Accordingly, the *Stone* Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search and seizure was introduced at his trial." *Id.* at 494.

To be sure, Fourth Amendment claims may be raised in the context of a habeas petition "(a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992). However, this case presents neither of those situations. First, New York has a corrective procedure for redressing Fourth Amendment violations of the sort petitioner alleges. Second, petitioner was not precluded from using that mechanism; he was granted a *Dunaway* hearing, at which he was

given a full opportunity to argue that he was arrested without probable cause and that the statements he made thereafter at the precinct should have been dismissed as fruits of his unlawful arrest. Indeed, petitioner does not allege that he was not given a full and fair opportunity to litigate the *Dunaway* issue, but instead faults the decision reached by the Court following that hearing. Since petitioner has failed to show a lack of State corrective procedures or a breakdown in the underlying process, this claim for habeas relief must be denied. *See Simpson v. West*, No. 05-CV-2279 (NGG), 2006 WL 1367412, at *5 (E.D.N.Y. May 18, 2006); *see also Anderson v. Corcoran*, No. 05 Civ. 436 (KNF), 2007 WL 1288539, at *3 (S.D.N.Y. May 2, 2007) (a habeas petitioner's claim that the officers who arrested him lacked probable cause to do so was not cognizable in a habeas proceeding in which the trial court provided the petitioner a full and fair opportunity to litigate the claim at a *Dunaway* hearing).

**The Third Ground – *Violation of the Vienna Convention on Consular Relations***

Petitioner's third ground for habeas relief alleges that petitioner was deprived of "Constitutional and statutory right[s] when the [trial] court received and considered evidence which was obtained in violation of the 'Vienna Convention on Consular Relations, Article 36(1)(b).'" Petition at 4-5. Article 36 of the Vienna Convention on Consular Relations (the "VCCR"), "concerns consular officers' access to their nationals detained by authorities in a foreign country." *Sanchez-Llamas v. Oregon*, ___U.S.___, 126 S.Ct. 2669, 2675 (2006). Article 36(1)(b) provides that, upon request of the national being detained, "the competent authorities" in the country of detention "shall, without delay, inform the consular post" of the national's country "if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner." VCCR 36(1)(b). In other words,

"when a national of one country is detained by authorities in another, the authorities must notify the consular officers of the detainee's home country if the detainee so requests." *Sanchez-Llamas*, 126 S.Ct. at 2675. Article 36(1)(b) also provides that authorities in the country of detention "shall inform the person concerned without delay of his rights" under the subsection.

Since Article 36 expressly states that it was drafted "[w]ith a view to facilitating the exercise of consular functions," there is a substantial question as to whether Article 36 grants rights which may be invoked by individuals in a judicial proceeding. In its recent decision in *Sanchez-Llamas*, the Supreme Court merely assumed, without deciding, that Article 36 grants such individual rights. *Sanchez-Llamas*, 126 S.Ct. at 2677-78. However, the *Sanchez-Llamas* Court also determined that suppression of evidence "would be a vastly disproportionate remedy for an Article 36 violation." *Id*. at 2681. Accordingly, following *Sanchez-Llamas*, it is clearly established that Federal law does *not* require suppression of statements or other evidence obtained as a result of the failure to alert a consulate or to inform a criminal defendant of his rights under Article 36.

As previously discussed, a federal court may grant a writ of habeas corpus to a state prisoner on a claim which was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). As used in § 2254(d)(1), the "clearly established" phrase "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the

relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000)   Thus, "clearly established Federal law" is "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (citing *Williams v. Taylor*, 529 U.S. 362, 405, 412 (2000)).

Since *Sanchez-Llamas* was decided in June 2006, after the State courts ruled on the VCCR issues in this case, *Sanchez-Llamas* does not control this case.  Rather, the relevant question is whether any pre-*Sanchez-Llamas* holdings of the United States Supreme Court required the State courts to suppress petitioner's statements on the ground that he had not been advised of his rights under Article 36 of the VCCR.

The answer to this question is readily apparent from a careful reading of *Sanchez-Llamas*. First, the Court implied that it had not yet determined the question of whether Article 36 gave rise to any individual rights by assuming, without deciding, that it did so.  If the Supreme Court had previously held that Article 36 created such rights, the Court would not have needed to make any such assumption.  Second, in holding that suppression was not an appropriate remedy for violations of Article 36, the *Sanchez-Llamas* decision did not distinguish any Supreme Court precedent or imply that it was overruling clearly established Federal law.  This implied that the Supreme Court had not previously addressed the issue of whether a violation of the VCCR warranted the exclusion of evidence.

In his § 440.10 motion, petitioner did not cite to any Supreme Court cases in support of his contention that an Article 36 violation can be a "ground for suppressing incriminating statements made by foreign nationals while in police or government custody."  Petitioner's § 440.10 Motion at 17.  Rather, petitioner relied on an opinion of the Superior Court of

Delaware: *State v. Reyes*, 740 A.2d 7 (Del. Super. Ct., New Castle County 1999). Although that opinion did, in fact, hold that a police officer's failure to inform a foreign national of his right to contact his consulate required suppression of the national's statement, the decision on which the *Reyes* Court relied – *United States v. Lombera-Camorlinga*, 170 F.3d 1241(9th Cir. 1999) – was subsequently withdrawn, *United States v. Lombera-Camorlinga*, 188 F.3d 1177 (9th Cir. 1999), and was later overturned by *United States v. Lombera-Camorlinga*, 206 F.3d 882 (9th Cir.)(en banc), *cert. denied*, 531 U.S. 991 (2000). As another judge in Delaware Superior Court noted in May 2001, it is unlikely that even Delaware Superior Court would have decided this issue the same way following the Ninth Circuit's 2000 *en banc* decision in *Lombera-Camorlinga*. *See State v. Vasquez*, Nos. CR.A.98-01-0317-R2, CR.A.98-02-1488-R2, 2001 WL 755930, at *1 (Del. Super. Ct. 2001) (unpublished decision) ("*Reyes* . . . was based upon case law which has since been overruled. It is very likely that this Court would decide the matter differently now based on the current state of the law regarding consular notification.")

This Court's independent research has not located any Supreme Court cases which hold that the State court was required to suppress petitioner's statements because petitioner was never advised of his rights under Article 36 of the VCCR. Therefore, although petitioner alleges that his "Constitutional and statutory rights" were violated by the trial court's decision to receive and consider evidence which was obtained in violation of the Vienna Convention on Consular Relations, Article 36(1)(b), there is nothing to suggest that the trial court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *See* 28 U.S.C. § 2254(d)(1). Accordingly, petitioner's third claim for habeas relief is without merit.

***The Fourth and Fifth Grounds for Habeas Relief – Ineffective Assistance of Counsel***

The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. Amend. VI. This right to counsel is "the right to *effective* assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970) (emphasis added). The Supreme Court has explained that, in giving meaning to this requirement, courts must be guided by its purpose – "to ensure a fair trial" – and that therefore the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order to prevail on a Sixth Amendment claim, a petitioner must prove both that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," *id.* at 688, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. *See also Wiggins v. Smith*, 539 U.S. 510, 521-22 (2003); *United States v. Eyman*, 313 F.3d 741, 743 (2d Cir. 2002). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

The performance and prejudice prongs of *Strickland* may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . , that course should be followed." *Id.* at 697. In evaluating the prejudice suffered by a petitioner as a result of counsel's deficient performance, the court looks to the "cumulative weight of error" in order to determine whether the prejudice "reache[s] the constitutional threshold." *Lindstadt v. Keane*, 239 F.3d 191, 202 (2d Cir. 2001). The court must also keep in

mind that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696. "The result of a [criminal] proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Purdy v. Zeldes*, 337 F.3d 253, 260 (2d Cir. 2003) (quoting *Strickland*, 466 U.S. at 694). Ineffective assistance may be demonstrated where counsel performs competently in some respects but not in others. *See Eze v. Senkowski*, 321 F.3d 110, 112 (2d Cir. 2003).

As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. Counsel, in other words, "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. The Court of Appeals for the Second Circuit has gone so far as to imply that all of counsel's significant trial decisions must be justified by a sound strategy. *See Eze*, 321 F.3d at 136 (remanding to district court for factual hearing because it was "unable to assess with confidence whether strategic considerations accounted for . . . counsel's decisions"). However, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

In this case, petitioner advances the precise same grounds for ineffective assistance that he raised in his § 440.10 motion. Specifically, plaintiffs alleges six grounds: (1) that "hearing

52

counsel failed to investigate, advise, and argue the violation of [petitioner's] VCCR rights"; (2) that hearing counsel failed to investigate, prepare a defense, and interview or call any witnesses on petitioner's behalf; (3) that hearing counsel failed to advise and protect petitioner from becoming a witness against himself on the stand; (4) that trial counsel failed to interview or call any witnesses and failed to pursue a coherent defense strategy; (5) that trial counsel failed to request that the court charge the jury on the lesser included offense of manslaughter in the second degree; and (6) that trial counsel failed to investigate and bring to light the violation of petitioner's VCCR right. As explained below, none of these grounds provide a basis for alleging ineffective assistance of counsel.

First, the Second Circuit and several lower courts have already rejected the argument that counsel can be ineffective for failing to advise a client of his or her rights under Article 36 or for failing to seek relief for violations of the VCCR. *See United States v. De La Pava*, 268 F.3d 157, 163 (2d Cir. 2001); *James v. United States*, Nos. 05 CV 8159 (LAP), 02 CR. 150 (LAP), 2006 WL 2850193 (S.D.N.Y. Oct. 5, 2006); *Alcantara v. United States*, Nos. 02 Civ. 5991 (DC), 99 CR. 1254 (DC), 2003 WL 102873 (S.D.N.Y. Jan. 10, 2003); *United States v. Arango*, No. 99 CV 3726 (RR), 1999 WL 1495422 (E.D.N.Y. Dec. 29, 1999). Article 36 serves to "ensure that a foreign national charged with a violation of American law is visited by an official representative of his native country who can explain to him his rights as a criminal defendant in the United States . . . ." *James*, 2006 WL 2850193, at *4 (quoting *Alcantara*, 2003 WL 102873, at *3); *Arango*, 1999 WL 1495422, at *3. However, once defense counsel enters the case, he or she "assumes full responsibility for safeguarding these . . . rights." *Arango*, 1999 WL 1495422, at *3; see *Alcantara*, 2003 WL 102873, at *3. Since a represented defendant will have already

"received all of the benefits that . . . consular notification would have provided," *James*, 2006 WL 2850193, at *4, "a defense attorney cannot be labeled ineffective for failing to advise his client of the right to speak to a diplomatic official who could do no more to protect his rights than counsel himself ." *Alcantara*, 2003 WL 102873, at *3 (quoting *Arango*, 1999 WL 1495422, at *3).

Counsel was also not ineffective for failing to move to suppress petitioner's statement on the ground that petitioner was deprived of his rights under the VCCR. Petitioner cannot make out the second prong of the *Strickland* standard: that there is a reasonable probability that the outcome of this case would have been different if counsel had raised this argument. While it may be true that there was no controlling authority in this Circuit which prevented counsel from moving to suppress on this basis in 1997, petitioner has not cited any authority which supported this argument. Indeed, the only case which petitioner cites in support of suppression is *State v. Reyes*, *supra* – the 1999 Delaware Superior Court decision which has been thoroughly discredited above. *See* p. 48-49, *ante*. The Circuit Courts which subsequently addressed the issue unanimously rejected suppression as a remedy for a violation of the VCCR. *See*, *e.g.*, *United States v. Page*, 232 F.3d 536, 540 (6th Cir. 2000); *United States v. Li*, 206 F.3d 56, 60 (1st Cir. 2000); *Lombera-Camorlinga*, 206 F.3d at 885 (en banc). Since there is little possibility that counsel could have persuaded the trial court to grant suppression on this basis, hearing counsel could not be considered ineffective for failing to make this argument. *See De La Pava*, 268 F.3d at 163 (counsel not ineffective for failing to move to dismiss under the VCCR where violation of VCCR was subsequently held not to be grounds for dismissal).

Petitioner's claim that hearing counsel failed to investigate, prepare a defense, and interview or call any witnesses on petitioner's behalf also fails because petitioner cannot make

out the second prong of *Strickland*.  Petitioner asserts that he urged hearing counsel to interview and subpoena his co-workers and family members who could have testified that petitioner had no marks on his face at the time he was arrested.  Petitioner concedes that defense counsel called his brother, Ronnie, to testify to this very fact, but claims the hearing court rejected this argument solely because it viewed Ronnie as an interested witness.  Petitioner asserts that if defense counsel had called his co-workers or other family members to corroborate Ronnie's testimony, the hearing court would have discredited testimony in which police detectives denied beating petitioner.

The only potential witness specifically identified in petitioner's papers, however, is petitioner's cousin, Ramraj Singh.  In an affidavit which was attached as Exhibit F to petitioner's § 440.10 motion, Mr. Singh stated that he had occasion to observe petitioner's face at a family barbeque on Sunday, October 1, 1995, and did not see any marks, bruises or anything else unusual.  This testimony was substantively the same as Ronnie's.  Both Mr. Singh and Ronnie are related to petitioner.  Petitioner offers no credible explanation why the hearing court, which discounted Ronnie's testimony, would be more likely to credit Mr. Singh's testimony or the testimony of any of the other relatives who were present at the family barbeque.

Significantly, petitioner does not provide affidavits from any of his former co-workers.  It is, therefore, unclear whether any of them had an opportunity to observe petitioner's face during the few minutes that petitioner remained at the worksite before being escorted to the precinct.  It is also unclear whether any of them would be able and willing to testify that his face was unmarked.  Petitioner's assertion that defense counsel could have found co-workers who could testify concerning petitioner's appearance on the morning of October 2, 1995, is therefore entirely speculative.  *See Greenidge v. United States*, No. 01 CV 4143 (ILG), 2002 WL 720677,

at *2 (E.D.N.Y. Mar. 27, 2002) (by failing to identify the witnesses who defense counsel purportedly failed to call, petitioner failed to sustain his burden under *Strickland*).

Petitioner's third claim – that hearing counsel failed to advise and protect petitioner from becoming a witness against himself – is also without merit. The decision to have petitioner testify at the hearing was not only a strategic one, but a decision which was central to presenting the coercion argument. As the only non-police witness to the alleged coercion, petitioner's testimony concerning the events in the interview room was vital to his defense.

Indeed, petitioner does not appear to argue that the decision to have him testify was an error. Rather, petitioner asserts that counsel could have better prepared him for cross-examination and could have objected to damaging questions. Petitioner's argument, however, is entirely speculative. Petitioner does not explain what hearing counsel could have done to better prepare petitioner, or how that preparation would have helped petitioner to better endure the rigors of cross-examination. In addition, petitioner does not identify which of the prosecution's questions were objectionable. This Court notes that defense counsel did, in fact, object to several questions during the cross-examination of petitioner, but that most of the questions asked by the prosecution were not objectionable.

Petitioner's remaining ineffective assistance claims – that trial counsel failed to pursue a coherent trial strategy and to request that the trial court charge the jury on the lesser included offense of manslaughter in the second degree – were deemed procedurally defaulted by the trial court when raised in petitioner's § 440.10 motion. New York law requires that a § 440.10 claim be denied where the defendant unjustifiably fails to raise the claim on direct appeal despite an adequate record. *See* N.Y. Crim. Proc. Law § 440.10(2)(b). Since there was no need to expand the appellate record before making arguments concerning the coherence of defense counsel's

trial strategy and his failure to request the manslaughter charge, the trial court held that both issues should have been raised on appeal and were not properly raised in petitioner's § 440.10 motion. *See People v. Ramdeo*, Ind. No. 4521/95, slip op. at 7-9 (N.Y. Sup. Ct. Queens County Mar. 11, 2003).[5]   The trial court's ruling clearly and unambiguous relies on § 440.10(2)(b) as the basis for its decision. *Id.*

A federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  Under the cause and prejudice standard, "'cause' . . . must be something *external* to the petitioner, something that cannot be fairly attributed to him." *Id.* at 753.  Generally, "[a]ttorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of attorney error.'" *Id.* (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  However, "if the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State." *Murray*, 477 U.S. at 488.  Thus, attorney error that rises to the level of ineffective assistance of counsel can constitute "cause." *Coleman*, 501 U.S. at 753-54.

---

[5]As the Supreme Court explained in the context of a motion brought pursuant to 28 U.S.C. § 2255, there are several good reasons to abandon this approach. *See Massaro v. United States*, 538 U.S. 500, 506-07 (2003).  However, although "New York is free to adopt a rule allowing defendants with multiple ineffectiveness claims to consolidate them for a § 440 motion, even when some of those claims were sufficiently developed for direct appeal," the State has not done so. *Sweet v. Bennett*, 353 F.3d 135, 141 (2d Cir. 2003).

In this case, the procedural default was a result of appellate counsel's decision not to raise the ineffective assistance of counsel claims on direct appeal. For the reasons set forth below, *see* pp. 58-63, *post*, this Court concludes that appellate counsel did not provide ineffective assistance. Thus, appellate counsel's failure to raise the ineffective assistance claims cannot serve as "cause." *See Coleman*, 501 U.S. at 753; *Murray*, 477 U.S. at 488.

Since petitioner cannot demonstrate cause for the default, this Court can review the defaulted claims only if petitioner can "demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *See Coleman*, 501 U.S. at 750. However, a fundamental miscarriage of justice occurs only "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496. A petitioner establishes actual innocence by demonstrating that "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Dixon v. Miller*, 293 F.3d 74, 81 (2d Cir. 2002) (internal quotations omitted).

In this case, petitioner has not demonstrated actual innocence. The instant petition raises three arguments relating to suppression of petitioner's statement and faults his attorneys for the quality of their representation. However, petitioner does not establish that he is innocent of the crimes of which he was convicted. Indeed, any possibility of arguing actual innocence was lost when petitioner tacitly admitted his involvement in Salerno's murder in the course of his cross-examination at the suppression hearing. Accordingly, petitioner also has not established a "fundamental miscarriage of justice."

Since petitioner has proved neither cause and prejudice nor a fundamental miscarriage of justice, this Court cannot review petitioner's claims regarding the coherence of defense counsel's trial strategy and his decision not to seek a charge on the lesser included offense of manslaughter

in the second degree.  *See Coleman*, 501 U.S. at 750.  However, even if this Court could review these claims, it would conclude that they were without merit.  First, defense counsel had a coherent trial strategy.  Capitalizing on the fact that most of the prosecution witnesses had been unable to identify any of the perpetrators, trial counsel argued that the prosecution had not proved petitioner's guilt beyond a reasonable doubt.  Trial counsel argued that the only two eyewitnesses who inculpated petitioner – Singh and Deonarain – had incentives to testify falsely against him.  In addition, trial counsel asserted that the jury should not credit Grecco's testimony concerning petitioner's alleged admission, both because Grecco had testified falsely concerning the time of day when petitioner was arrested and because the statement itself provided little detail concerning the Salerno murder itself.

Second, trial counsel's failure to request a charge on the lesser included offense of manslaughter in the second degree did not constitute ineffective assistance of counsel.  Defense counsel's strategy, which denied guilt altogether, "practically preclude[d] a request for an instruction on a lesser included offense."  *Yu v. United States*, No. 97 Civ. 2736 (MBM), 1997 WL 423070, at *3 (S.D.N.Y. June 29, 1997) (quoting *Rios v. United States*, No. CV-91-4384 (CPS), 1992 WL 328931, at *6 (E.D.N.Y. Oct. 13, 1992)).  Trial counsel's decision not to request a charge on manslaughter in the second degree was, therefore, a strategic one, and cannot provide a basis for claiming ineffective assistance of counsel.

### The Fifth Ground for Habeas Relief – Ineffective Assistance of Appellate Counsel

Petitioner's fifth and final ground for habeas relief alleges that appellate counsel's assistance was ineffective in three respects.  First, petitioner faults appellate counsel for failing to argue ineffective assistance of trial counsel, based on trial counsel's decision not to request a

charge on the lesser included offense of manslaughter in the second degree and trial counsel's alleged failure to pursue a coherent strategy. Second, petitioner argues that appellate counsel was ineffective in failing to argue that the trial court erred in not granting the defense motion to dismiss the indictment based on insufficiency of the evidence. Third, petitioner asserts that appellate counsel should have argued that the trial court erred in failing to grant a mistrial based on the prosecutor's allegedly improper summation.

Although the *Strickland* test was formulated in the context of an ineffective assistance of trial counsel claim, the same test is used with respect to claims of ineffective appellate counsel. *See Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992). Appellate counsel does not have a duty to advance every nonfrivolous argument that could be made, *see Jones v. Barnes*, 463 U.S. 745, 753-54 (1983), but a petitioner may establish that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994). Either a federal or a state law claim that was improperly omitted from an appeal may form the basis for an ineffective assistance of appellate counsel claim, "so long as the failure to raise the state . . . claim fell outside the wide range of professionally competent assistance." *Id.* (internal quotations omitted).

None of the three arguments which petitioner faults appellate counsel for failing to raise has any merit whatsoever. First, the trial record did not contain facts to support a claim of ineffective assistance of trial counsel. Contrary to petitioner's assertions, trial counsel had a coherent strategy: he argued that the evidence adduced by the prosecution was insufficient to prove petitioner's guilt beyond a reasonable doubt. In his summation, defense counsel carefully reviewed the testimony of the witnesses at trial, arguing that they either had not inculpated

petitioner or had testified falsely with respect to petitioner's involvement. For example, defense counsel noted that the eyewitnesses who had observed the assault on Ramkishun and six of the eight witnesses who had observed portions of the attack on Salerno could not identify petitioner as a participant in the attack. Defense counsel also implied that the two eyewitnesses who could implicate petitioner in the murder had, themselves, been charged with the crime and, therefore, had reason to falsely accuse petitioner in order to exculpate themselves. Defense counsel further implied that Detective Grecco had fabricated the inculpatory portions of the petitioner's statement.

In light of the defense strategy, trial counsel was not ineffective in failing to seek a charge on the lesser included offense of manslaughter in the second degree. Defense counsel did not argue that there was insufficient proof as to a particular element of the offense charged. Rather, he sought a complete acquittal on the ground that there was inadequate proof of petitioner's involvement.

As discussed above, the strategic decision to deny guilt altogether or to pursue a complete acquittal practically precludes a request for an instruction on a lesser included offense. *See*, *e.g.*, *Yu*, 1997 WL 423070, at *3 (quoting *Rios*, 1992 WL 328931, at *6). "The decision to pursue a completely exculpatory defense is one that enjoys substantial deference." *Id.* (citing *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987)). Accordingly, where counsel pursues an exculpatory defense, courts have declined to find ineffective assistance of counsel for the failure to request a charge on lesser included offenses. *See Rios*, 1992 WL 328931, at *6-7.

Second, there was no merit to the claim that the evidence adduced at trial was insufficient to prove beyond a reasonable doubt that petitioner was guilty of murder in the second degree. Petitioner, who cites to cases involving circumstantial evidence, ignores the fact that his alleged

statement to Detective Grecco alone, if credited by the jury, was sufficient to establish that petitioner wielded the machete during the attack on Salerno. Moreover, Dr. Lee's testimony, if credited, was sufficient to establish that the machete struck the fatal blow. In light of this evidence that petitioner himself killed Salerno, there was no need for the jury to find that petitioner shared Alvin's *mens rea* in order to convict him of murder in the second degree. Accordingly, there was no basis for arguing that the evidence was insufficient to convict him of that crime or that petitioner's conviction for murder in the second degree was against the weight of the evidence.

Third, the prosecutor's summation was not nearly so prejudicial as to deprive petitioner of his due process right to a fair trial. Petitioner never identified any instance in which the prosecutor unfairly denigrated the defense strategy. Rather, petitioner merely cites to a portion of the transcript in which the prosecution countered defense counsel's assertion that guilt was not proved beyond a reasonable doubt. Defendant's Writ of Error Coram Nobis at 30 (citing T. 1378-79). Petitioner also never identified any instance in which the prosecution relied on evidence outside the record; instead, petitioner cites to instances in which the prosecutor discussed the absence of certain serological evidence, *id.* at 32, and argues that certain of the prosecutor's analogies, such as comparing petitioner and his friends to a "squad of soldiers" or a sports team, were improper. *Id.* at 30. However, petitioner's objection to the soldier analogy was sustained (T. 1409), and the analogy to a baseball team did not, as petitioner suggests, mislead the jury regarding the quantum of proof necessary to establish acting in concert.

Similarly, petitioner has not identified instances in which the prosecutor improperly vouched for any of his witnesses. First, petitioner argues that it was improper for the prosecutor to assert that Grecco could have concocted a more detailed account of Salerno's murder if he had

wanted to.  *See* Defendant's Writ of Error Coram Nobis, at 34.  However, this argument, taken in

context, was not an expression of personal belief but an appropriate response to defense

counsel's argument that this portion of petitioner's written statement had to be fabricated

because it lacked details.  *See People v. Ortiz*, 217 A.D.2d 425, 425, 629 N.Y.S.2d 235, 236

(N.Y. App. Div. 1ˢᵗ Dep't 1995) (prosecutor's argument that police witnesses could have done a

better job of lying if they were so inclined held to be an appropriate response to defendant's

challenge to the credibility of prosecution witnesses).  Second, petitioner asserts that it was

improper for the prosecutor to suggest that Grecco was likely more accurate about the time of

petitioner's arrival at the precinct than Schwartz, who refreshed his recollection from notes.  *See*

Defendant's Writ of Error Coram Nobis, at 35.  This argument was not only in direct response to

defense counsel's claim that Grecco had lied about the time, but was an entirely appropriate

discussion of  the relative credibility of the witnesses.  Similarly, the prosecutor's argument that

the "sloppy" police work in this case should not be compared to the perfection exhibited in

television dramas and the argument that Deonarain was present in court with his relatives were

both fair responses to defense counsel's summation.

 Petitioner's claim that the prosecutor shifted the burden of proof by asking, "Where is

Ronnie?" misconstrues the entire thrust of this comment.  The prosecutor used this line in an

attempt to counter defendant's argument that Annunziata might have planted physical evidence

at the apartment that petitioner and Ronnie shared by pointing out that Ronnie "was with the

detectives when they searched the residence" (T. 1393).  Thus, the prosecutor was not asking

why Ronnie failed to testify at trial, but pointing out that Annunziata did not have the

opportunity to plant evidence in the apartment without Ronnie's knowledge.

Finally, taken as a whole, the charge did not appeal to emotion. Although the prosecutor's comments concerning the "audacity of the deceased [in] fighting back and not allowing these people to do whatever they want[ed]" (T. 1407) might be improper, this comment alone was not so prejudicial as to deprive petitioner of a fair trial. Accordingly, there was no merit to the argument that the prosecutor's summation was so prejudicial as to deprive petitioner of a fair trial.

Even if any of petitioner's three proposed appellate arguments had any merit, petitioner could not establish that his appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *See Mayo*, 13 F.3d at 533. Petitioner's appellate counsel raised four arguments on petitioner's behalf, all of which were considerably stronger than any of those proposed by petitioner. Indeed, the first of these – that the evidence at trial was legally insufficient to sustain petitioner's conviction for assault in the second degree – proved successful, and resulted in the vacating of petitioner's assault conviction. Since petitioner had received a consecutive five-year term of imprisonment for the assault, the vacating of this conviction significantly reduced petitioner's term of incarceration. In light of the results of petitioner's direct appeal, this Court finds no merit to petitioner's claim of ineffective assistance of appellate counsel.

## CONCLUSION

For the reasons set forth above, the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and this action is dismissed. Since petitioner has not made a substantial showing of the denial of a constitutional right, no certificate of appealability is granted with respect to any of petitioner's claims. *See* 28 U.S.C. § 2253(c)(2); *Lozada v. United*

*States*, 107 F.3d 1011, 1017 (2d Cir. 1997) (discussing the standard for issuing a certificate of appealability), *abrogated on other grounds*, *United States v. Perez*, 129 F.3d 255, 259-60 (2d Cir. 1997).

    **SO ORDERED.**

*Sandra L. Townes*
_____
SANDRA L. TOWNES
United States District Judge

Dated: Brooklyn, New York
        July 6, 2007